United States District Court
Southern District of Texas
**ENTERED**
September 23, 2020
David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| Colony Insurance Company, § | | |
| Plaintiff, § | | |
| § | | |
| v. § | Civil Action H-18-3429 | |
| § | | |
| First Mercury Insurance Company, § | | |
| Defendant. § | | |

## ORDER DENYING MOTION FOR SUMMARY JUDGMENT

A general contractor for the construction of an apartment complex in Houston was sued by the complex owner for damage caused by construction defects. The case settled without a trial. Many entities contributed to the settlement. Colony Insurance Company (Colony), the general contractor's insurer on an excess policy, contributed close to $2 million to the settlement. First Mercury Insurance Company (First Mercury), another excess insurer, denied coverage and refused to contribute to the settlement. Colony has sued First Mercury for breach of contract based on theories of contractual and equitable subrogation. That is, Colony now attempts to stand in the shoes of its insured and seeks to recover that part of the settlement that First Mercury should have paid on behalf of the insured.

Pending before the court is Defendant First Mercury Insurance Company's Motion for Summary Judgment. (D.E. 30.) Because there are genuine issues of material fact in dispute, the motion for summary judgment is DENIED.

**1. Background**

In 2012, Cambridge Builders & Contractors, LLC[1] (Cambridge) contracted to build an apartment complex for Archstone Memorial Heights Villages I LLC (Archstone). (D.E. 22-6 ¶ 8.) Cambridge served as the general contractor for the project until the final certificate of occupancy was issued on October 23, 2014. (D.E. 30-6.) Cambridge maintained concurrent primary and excess insurance policies throughout construction. The policies were provided by First Mercury, Colony, and Navigators Specialty Insurance Company (Navigators) as follows:

| Policy Period | Primary Policy | Excess Policy |
|---|---|---|
| 2011 – 2012 | First Mercury[2] | First Mercury[3] |
| 2012 – 2013 | First Mercury[4] | First Mercury[5] |
| 2013 – 2014 | Navigators[6] | First Mercury[7] |
| 2014 – 2015 | Navigators | Colony[8] |

Each primary policy covered losses up to $1 million per occurrence. (D.E. 22-5 at 16, *Navigators primary 13–14;* D.E. 30-4 at 14, *FM primary 11–12*; D.E. 30-5 at 8,

---

[1] The company was later acquired by Cambridge Swinerton Builders, Inc. (D.E. 22-6 ¶ 11.) For purposes of this action, the court refers to these companies collectively as "Cambridge."
[2] D.E. 30-4 ("FM primary 11–12").
[3] D.E. 30-1 ("FM excess 11–12").
[4] D.E. 30-5 ("FM primary 12–13").
[5] D.E. 30-2 ("FM excess 12–13").
[6] D.E. 22-5 ("Navigators primary 13–14").
[7] D.E. 30-3 ("FM excess 13–14").
[8] D.E. 22-3 ("Colony excess 14–15").

*FM primary 12–13*.) Each excess policy covered residual losses up to $10 million. (D.E. 22-3 at 5, *Colony excess 14–15*; D.E. 30-1 at 2, *FM excess 11–12*; D.E. 30-2 at 9, *FM excess 12–13*; D.E. 30-3 at 7, *FM excess 13–14*.)

In 2015, Archstone sued Cambridge, alleging that construction defects caused water damage to the complex's sheathing, framing, patio decks, stair landings, stucco system, masonry, windows, and roof. (D.E. 22-6 ¶¶ 13–14.) Archstone sought $9 million to $11 million in damages, fees, and costs. (D.E. 22-6 ¶ 17.) Because the damages were alleged to have occurred over time, spanning the term of multiple insurance policies, the lawsuit implicated coverage under policies that had expired by the time the suit was filed. (D.E. 22-6 ¶ 13.) Navigators and First Mercury participated in Cambridge's defense as primary insurers. (D.E. 63-3 at 19.) Cambridge's attorney tendered the claim to First Mercury and Colony as Cambridge's excess insurers. *Id.*

In August of 2017, the parties engaged in mediation. (D.E. 1-1, 63-1.) That October, Archstone demanded $8.25 million to resolve all claims against Cambridge. (D.E. 22-9 at 3.) Cambridge's own expert witnesses calculated that Cambridge was liable for over $2.7 million in repair costs. (D.E. 63-1 at 6.) First Mercury and Navigators each paid $500,000 toward the settlement out of the primary insurance layer. (D.E. 1-1,[9] 22-9.) Based on that information, Colony

---

[9] Referenced in D.E. 22 at 12 and D.E. 30-8 at 13.

3

determined that slightly less than an additional $2 million would need to be paid from the excess layer to settle the case. Colony therefore requested that First Mercury contribute to the settlement, as it issued the excess policies that were in effect when the damage to the complex began. *Id.*

Colony admitted that it did "not necessarily agree" with the damage calculation from Cambridge's experts, but explained to First Mercury's counsel that the evidence showed that both excess insurers were obligated to indemnify Cambridge. (D.E. 1-1.) Colony warned First Mercury that if it was forced to fund a settlement without First Mercury's participation, Colony would seek reimbursement in a separate lawsuit. *Id.* First Mercury denied coverage and refused to contribute to the settlement, stating that it was not "provided any evidence or quantifying of any covered damage in the policy's term." (D.E. 22-9.) Colony paid $1,925,000 toward the settlement. (D.E. 30-12 at 5.) First Mercury paid nothing.

Colony filed this suit seeking reimbursement from First Mercury for its pro rata share of the settlement. Colony alleges that it is contractually and equitably subrogated to the claims of its insured against First Mercury. Colony argues that it is entitled to recover from First Mercury on behalf of Cambridge because First Mercury breached its duty to indemnify Cambridge in the underlying lawsuit. First Mercury denies that it breached any duty and categorizes Colony's contribution to the settlement as a voluntary business decision. First Mercury moves for summary

4

judgment, arguing that Colony has no right of reimbursement simply because Colony is "unhappy with the amount it chose to pay." (D.E. 30 at 1.)

## 2. Summary Judgment

"Summary judgment is appropriate only if, viewing the evidence in the light most favorable to the nonmovant, 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Davenport v. Edward D. Jones & Co.*, 891 F.3d 162, 167 (5th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). No genuine issue of material fact exists if a rational jury could not find for the nonmoving party based on the complete record. *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 455 (5th Cir. 2019) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The court reviews all evidence and reasonable inferences in the light most favorable to the nonmoving party. *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 350 (5th Cir. 2005). Still, the nonmovant must "articulate the precise manner in which the submitted or identified evidence supports his or her claim." *CQ, Inc. v. TXU Mining Co.*, 565 F.3d 268, 273 (5th Cir. 2009) (quoting *Smith ex. rel. Estate of Smith v. United States*, 39 F.3d 621, 625 (5th Cir. 2004)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The nonmovant must "go beyond the pleadings," using competent summary judgment evidence to cite to "specific facts" showing a genuine issue for trial. *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 468 (5th Cir. 2010).

### 3. Subrogation

As a preliminary matter, the parties disagree about whether Colony can recover on behalf of Cambridge under the facts and circumstances of this case. Colony asserts that it is contractually and equitably subrogated to Cambridge's rights as against First Mercury. Colony alleges that First Mercury breached one or more of its insurance contracts with Cambridge when it did not indemnify Cambridge in the underlying suit, even though there was clear evidence, according to Colony, that covered damage occurred during First Mercury's policy periods.

Colony's contribution to the settlement fully indemnified Cambridge, which, according to First Mercury, left Cambridge without any complaint against either insurance company. First Mercury thus argues that Cambridge no longer has any rights under which Colony may seek recovery. This argument is based on the Texas Supreme Court opinion in *Mid-Continent Ins. Co. v. Liberty Mut. Ins. Co.*, 236 S.W.3d 765, 777 (Tex. 2007). It is true that in *Mid-Continent* the court held that there could be no recovery under a subrogation theory against a co-primary insurer when the insured had been fully indemnified. *Id.* at 775-76. But much ink has been

6

spilled since *Mid-Continent* was decided. The Fifth Circuit has made clear in a series of cases that the holding of *Mid-Continent* is limited to its facts.[10] That is, there can be no recovery under a subrogation theory against a co-primary insurer only when neither insurer disputes coverage and the parties are subject to pro rata "other insurance" clauses. *See Amerisure*, 611 F.3d at 306. In *Amerisure*, the Fifth Circuit specifically held that contractual subrogation is not precluded "simply because the insured is fully indemnified." *Id.* at 307. Thus, First Mercury's main argument, that there can be no recovery in this case because Cambridge has been made whole, is not well taken.

*Mid-Continent* does not control in this case for another reason: First Mercury denied coverage to its insured. In *Amerisure*, the Fifth Circuit explained that *Mid-Continent*'s holding is not a definitive rule but an exclusion to the "settled principles" of Texas insurance law, which "give[s] dominant consideration to the rights of the insured." *Amerisure*, 611 F.3d at 308 (quoting *Hardware Dealers Mut. Fire Ins. Co. v. Farmers Ins. Exch.*, 444 S.W.2d 583, 589 (Tex. 1969)). The idea is that the insured is entitled to receive coverage that it contracts for and that insurers

---

[10] *Cont'l Cas. Co. v. N. Am. Capacity Ins. Co.*, 683 F.3d 79, 86 (5th Cir. 2012) ("[W]e have recognized that the *Mid-Continent* bar to recovery is narrow and limited to the facts of that case."); *Colony Ins. Co. v. Peachtree Constr., Ltd.*, 647 F.3d 248, 257–58 (5th Cir. 2011) (explaining that "a broad reading of *Mid-Continent* [is] at odds with foundational principles of Texas insurance law, as well as in conflict with later decisions of the Texas Supreme Court"); *Maryland Cas. Co. v. Acceptance Indem. Ins. Co.*, 639 F.3d 701, 706 (5th Cir. 2011) (reiterating the Fifth Circuit's "reject[ion] [of] an overly broad view of *Mid-Continent*'s subrogation exclusion"); *Amerisure Ins. Co. v. Navigators Ins. Co.*, 611 F.3d 299, 307 (5th Cir. 2010) (agreeing "with the majority of courts that have examined this issue" and rejecting "the overly broad view of *Mid-Continent*'s subrogation exclusion").

must act in the interests of their insureds. *See, e.g.*, *Cont'l Cas. Co.*, 683 F.3d at 87 (refusing to encourage insurers "to breach their duties to defend rather than place their insured's interests above their own by defending and seeking reimbursement later"). "[D]ueling coinsurers must place the interest of their insureds before their own." *Amerisure*, 611 F.3d at 308.

In that light, the holding of *Mid-Continent* makes perfect sense: Neither insurer denied coverage to their insured; the insured was always protected. The insurers merely disagreed about the settlement value of the case. Their differing business decisions about whether and how to settle the case would not give rise to any injury to the insured, so there was no cause of action in subrogation by the over-paying insurer against the under-paying insurer. However, things are different when coverage is disputed: The insured is not fully protected; they are at the whim of dueling insurance carriers. If the rule of *Mid-Continent* applied in this situation, it would encourage insurers to deny coverage in the hope that the other insurer pays, which, from Colony's point of view, is exactly what First Mercury did here.

*Mid-Continent* does not preclude recovery in this case. The court turns to the substance of Colony's subrogation claim.

### 4. Analysis

Three types of subrogation rights are recognized under Texas law: contractual, equitable, and statutory. *Peachtree Constr.*, 647 F.3d at 256. Colony's suit invokes

the first two. Contractual subrogation "is created by an agreement or contract that grants the right to pursue reimbursement from a third party in exchange for payment of a loss." *Mid-Continent*, 236 S.W.3d at 774. Colony's excess policy states that Colony "shall be subrogated to all [Cambridge's] rights of recovery against any person or organization." (D.E. 22-3 at 26, *Colony excess 14–15*.) Equitable subrogation "arises in every instance in which one person, not acting voluntarily, has paid a debt for which another was primarily liable and which in equity should have been paid by the latter." *Mid-Continent*, 236 S.W.3d at 774. Colony can thus seek recovery if the payment it made toward Cambridge's settlement was involuntary and if First Mercury breached its duty to pay.

A. **Colony's settlement payment was not voluntary.**

An insurer's voluntary payment toward a settlement prohibits recovery through equitable subrogation. *Peachtree Constr.*, 647 F.3d at 256. First Mercury argues that neither excess carrier was obligated to contribute to the underlying settlement because their only obligation in responding to settlement demands is to act as an ordinarily prudent person would in managing their own business.

In Texas, an insurer's payment toward settlement of a lawsuit is not voluntary if the insurer makes the payment "in good faith and under a reasonable belief that the payment is necessary" for the insured's protection. *Peachtree Constr.*, 647 F.3d at 256 (quoting *Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 20

9

S.W.3d 692, 702 (Tex. 2000)). "[A]n excess insurer's payment to settle a suit against the insured has been said to be presumptively involuntary for subrogation purposes." *Id.* at 256. First Mercury has not presented evidence to overcome this presumption. Here, the mediator told Colony that Cambridge's excess carriers needed to pay under their policies for the case to settle. (D.E. 1-1.) Thus, it was reasonable for Colony to believe that payment was necessary. Colony's payment was not voluntary for purposes of subrogation.

According to First Mercury, absent a trial and subsequent judgment, there is no duty to indemnify. Thus, it argues, both insurers here made voluntary business decisions—one decided to pay the settlement, the other not. First Mercury's argument implies that there is never an indemnity obligation without a trial. This is not the case. *See, e.g.*, *Am. Centennial Ins. Co. v. Canal Ins. Co.*, 843 S.W.2d 480, 482–83 (Tex. 1992) (collecting cases that recognized equitable subrogation "to encourage fair and reasonable settlement of lawsuits").

B. **Whether First Mercury should have paid is a fact question.**

Although Colony can seek recovery through subrogation, it still must prove an entitlement to reimbursement. *Amerisure*, 611 F.3d at 308 (finding that a contractual subrogation right entitled the over-paying insurer to recovery only if it paid in the absence of a duty to indemnify). Colony has the burden to prove that First Mercury failed to pay a covered loss.

According to First Mercury, Colony has not presented any facts to show that Cambridge's loss was covered under First Mercury's excess policy. "A liability policy obligates an insurer to indemnify the insured against a covered loss arising from the insured's own legal liability." *Mid-Continent*, 236 S.W.3d at 775. The insured bears the burden of establishing coverage. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010). The burden then shifts to the insurer to prove that an exclusion applies. *Id.* If successful, "the burden shifts back to the insured to show that an exception to the exclusion brings the claim back within coverage." *Id.*; *see Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 848 (Tex. 1994) (confirming that "an insurer has no duty to settle a claim that is not covered under its policy"). Colony, standing in the shoes of Cambridge, bears the burden of establishing coverage.

### (1) Coverage under First Mercury's excess policy
#### (a) Exhaustion under the primary layer

First Mercury's excess insurance policies were only triggered if the concurrent primary insurance policies were exhausted. Each primary policy insured Cambridge for $1 million per occurrence. (D.E. 22-5 at 16, *Navigators primary 13–14*; D.E. 30-4 at 14, *FM primary 11–12*; D.E. 30-5 at 8, *FM primary 12–13*.) They each defined an occurrence as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (D.E. 22-5 at 33, *Navigators primary 13–14*; D.E. 30-4 at 30, *FM primary 11–12*; D.E. 30-5 at 24,

*FM primary 12–13*.) The parties do not dispute that the "occurrence" in this case was Cambridge's failure to ensure proper construction of the building. For purposes of its motion, First Mercury "assume[s] that the case involves only a single occurrence." (D.E. 60 at 4.)

First Mercury argues that Colony has not shown that the primary policies paid $1 million per occurrence to exhaust the primary layer. Colony asserts that consecutive primary policies cover the loss. "[W]hen 'a single occurrence triggers more than one policy, covering different policy periods, . . . the insured's indemnity limit should be whatever limit applied at the single point in time during the coverage periods of the triggered policies when the insured's limit was highest.'" *N. Am. Specialty Ins. Co. v. Royal Surplus Lines Ins. Co.*, 541 F.3d 552, 557 (5th Cir. 2008) (quoting *Garcia*, 876 S.W.2d at 855). This principle prohibits "stacking" policy limits to provide a loophole that would allow higher recovery for incidents lasting longer than one policy term. *Id.* "Once the applicable limit is identified, all insurers whose policies are triggered must allocate funding of the indemnity limit among themselves according to their subrogation rights." *Garcia*, 876 S.W.2d at 855.

Colony, standing in the shoes of Cambridge, must (1) identify the highest limit of primary coverage and (2) show that this limit was paid by the insurer or insurers whose policies were triggered. The parties agree that the highest limit of primary coverage that Cambridge contracted for was $1 million per occurrence. Colony

12

presented evidence that Navigators and First Mercury each contributed $500,000 to the settlement out of their respective primary policies. In an email, counsel for First Mercury admitted to "tendering the primary limit with Navigators" and conceded that "the primary [was] paid." (D.E. 22-9.) First Mercury does not dispute that it contributed $500,000 toward the settlement from its primary policy. Because, for the purposes of this motion, First Mercury has conceded that a single occurrence led to Cambridge's loss,[11] Colony need only show that the primary insurers paid a total of $1 million toward the settlement.

Moreover, Cambridge's experts opined that Cambridge was liable for a total of $2,709,657 in repair costs. (D.E. 63-1 at 6.) The parties do not dispute that the $1 million tendered by the primary layer covered this loss. Even with the $1 million payment from the primary insurers, according to its own experts, Cambridge would have still been liable for the remaining $1,709,657. This remaining liability constitutes a loss that exceeded the primary insurance layer. Because Cambridge's loss exceeded the primary layer's payment, Colony met its burden to show that the primary layer was exhausted.

---

[11] To the extent that First Mercury does not concede at trial that a single occurrence caused Cambridge's loss, the number of occurrences constitutes a disputed fact issue. *See Evanston Ins. Co. v. Mid-Continent Cas. Co.*, 909 F.3d 143, 147–48 (5th Cir. 2018) (confirming that the number of occurrences is based on causation, which is a fact question).

### (b) Loss during First Mercury's policy

First Mercury argues that Colony has not presented evidence of covered losses that occurred during First Mercury's excess policy. First Mercury's 2013–14 excess policy covers injury or damage also covered under the primary policy that arises from "an occurrence, offense, accident, act, or other event, to which the [underlying primary policy] applies." (D.E. 30-3 at 10–11, 20, *FM excess 13–14*.) The underlying policy, issued by Navigators, applies to "property damage" that occurred between October of 2013 and October of 2014 due to "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (D.E. 22-5 at 19, 33, *Navigators primary 13–14*.) Thus, to show a loss covered under First Mercury's excess policy, Colony must show that the complex was physically damaged before November 7, 2014, due to an event that could be attributed to Cambridge.

As evidence of damage during the policy term, Colony produced emails from apartment complex personnel that describe leaks throughout the complex between February of 2013 and October of 2014. (D.E. 22-7, 22-8.) According to the emails, the apartment complex was physically damaged by leaks from a window, the roof, the night drop box, and an air conditioning unit. (D.E. 22-7; D.E. 22-8 at 10–12, 16, 23, 25–27, 30.) This property damage required repairs to flooring and sheetrock in over one dozen units. (D.E. 22-8 at 2–4, 8, 20, 22–25, 27.) While there are disputed

fact questions as to how the damage occurred or when it began, these emails constitute some evidence that damage occurred during First Mercury's excess policy period.

First Mercury previously asserted that the email evidence was improper summary judgment evidence because it consists of statements made by declarants in another proceeding and thus constitutes hearsay. (D.E. 23 at 10.) Even if this were true, Federal Rule of Evidence 56(c) "permits a party to support or dispute summary judgment through unsworn declarations, provided their contents can be presented in admissible form at trial." *Patel v. Tex. Tech Univ.*, 941 F.3d 743, 746 (5th Cir. 2019). First Mercury did not reassert its objection and it appears to the court that these documents are "capable of being presented in a form that would be admissible in evidence." *Id.* at 746–47 (quoting *Maurer v. Indep. Town*, 870 F.3d 380, 384 (5th Cir. 2017)).

### (c) Loss that relates back to First Mercury's policy

First Mercury argues that even if the emails show losses during the 2013–14 policy period, they do not show losses that exceed $1 million. This is important because First Mercury's excess policy is only triggered if covered losses exceed the $1 million limit of the primary layer. In response, Colony points to language in First Mercury's 2013–14 excess policy that states an "'[i]njury or damage' which occurs during the Policy period . . . includes any continuation, change or resumption of that

15

'injury or damage' after the end of the Policy period." (D.E. 30-3 at 11, *FM excess 13–14*.) Based on this language, First Mercury's excess policy covers not only physical damage that occurred prior to November 7, 2014, but also any continuation of that damage that occurred after November 7, 2014. The parties do not disagree on the meaning of this provision. The monetary requirement for coverage is therefore not restricted to physical damage that occurred during the 2013–14 policy term. Instead, to show losses that exceed $1 million, Colony may add together both the amount of any damage that occurred during the 2013–14 policy plus the amount of any loss that occurred after November 7, 2014, if the later damage extended from the 2013–14 damage and was caused by the same single occurrence.

During a hearing on this motion, Colony's counsel explained that the parties exchanged hundreds of pages of documents that showed Cambridge's covered loss consisted of millions of dollars in necessary repairs. Following the court's subsequent order that the parties supplement their filings, Colony attached 160 pages of expert reports and mediation summaries to its supplemental brief. (D.E. 63.) First Mercury has not objected to these documents. The reports show that First Mercury was on notice that experts found damage in 2016 and 2017 that could support a continuation or resumption of the damage reported during First Mercury's 2013–14 policy period. For example, experts opined that leaks through the night drop box, roof, air conditioner, windows, and drains caused stains, decay, cracks, and water

16

damage. (D.E. 63-2 at 4–7, 10–14, 23–25, 27–28, 30–31, 47–48; D.E. 63-3 at 11–13, 19.) Because the leaks came from the same places and resulted in the same types of damage as reported in the 2013–14 emails, these documents are enough to create a fact question as to how the damage occurred or when it began, which should be decided at trial. *See Peachtree Constr.*, 647 F.3d at 258 (vacating summary judgment and remanding case to consider coverage based on evidence that raised a question of fact). Colony has presented evidence that a fact issue exists as to coverage under First Mercury's excess policies.

### (2) Exclusions under First Mercury's excess policies

Because Colony has met its burden to show coverage under First Mercury's excess policy, the burden then shifts to First Mercury to show that an exclusion applies. *See Gilbert Tex. Constr.*, 327 S.W.3d at 124. First Mercury points to an exclusion to property damage in its 2013–14 excess policy:

> **c. Damage to Property**
> "Property damage" to:
> . . . .
> (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations;
>
> (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

(D.E. 30-3 at 12, *FM excess 13–14*.) According to First Mercury, this exclusion means that its policy only covered a loss that occurred after Cambridge completed

17

its work. First Mercury asserts that Cambridge's work was completed on October 23, 2014, when the final certificate of occupancy was issued. However, Colony argues that work was completed prior to October of 2014. For example, Colony presented evidence that temporary certificates of occupancy were issued as early as February 7, 2014, and evidence that the property was turned over to the property manager as early as March 28, 2014. (D.E. 22-8 at 29; D.E. 22-11 at 6 ¶¶ 15–21.) A fact issue exists as to when exactly Cambridge was "performing operations" under the exclusion.

First Mercury does not refute Colony's position and instead argues that "[d]amage outside of the policy period is excluded by the terms of the insuring agreement, not an exclusion" and reasserts Colony's burden to prove coverage. (D.E. 60 at 14 n.2.) Because First Mercury has not shown that an exclusion applies as a matter of law, it has not met its burden at the summary judgment stage.

## 5. Conclusion

First Mercury has not met the summary judgment burden because genuine issues of material fact exist. First Mercury's Motion for Summary Judgment (D.E. 30) is DENIED.

Signed at Houston, Texas, on September 22, 2020.

_____
Peter Bray
United States Magistrate Judge